THE STATE *ex rel.* ATTORNEY GENERAL v. MERCHANT'S EXCHANGE MUTUAL BENEVOLENT SOCIETY.

1. **Insurance**: A BENEVOLENT SOCIETY HELD AN INSURANCE COMPANY. An association styled "The Merchant's Exchange Mutual Benevolent Society," had for its object the giving of financial aid to the widows and children of deceased members, or to such uses and purposes as members should by last will and testament direct. The funds used for this purpose consisted of assessments made upon the survivors at the death of a member, together with interest on a fund composed of the entrance or initiation fees paid by the several members upon entering the association. The members were divided into classes and the fees paid in by those belonging to each class were kept separate from the rest, and were used for the exclusive benefit of that class. The association was governed by

board of trustees assisted by the usual executive officers. *Held*, that it was a mutual insurance company.

2. **Benevolent Societies, when subject to the Insurance Laws.** The act of March 8th, 1879, relating to benevolent societies, (Sess. Acts, p. 65; R. S., §§ 972, 973,) was repealed by the third section of the act of May 19th, 1879, on the same subject, (Sess. Acts, p. 66; R. S., § 974,) or, at least, was so modified as to withdraw the exemption from the operation of the general statutes relating to life insurance conferred by the first named act from any benevolent society whose sole purpose was to give aid to the widows and children or legatees of deceased members. Under section 974 only those societies are entitled to that exemption which make the giving of such aid an incident to some other form of benevolence.

*Quo Warranto.*

OUSTER AWARDED.

The writ charged that respondent, without any charter, act of incorporation or other legal authority, was usurping and using the liberties, privileges, rights and franchises of a life insurance company; that it was making and entering into contracts whereby, in consideration of a stipulated sum of money paid to it, it undertook to indemnify individuals against losses by death; that it was insuring human lives for and in consideration of premiums paid to it; that it was receiving premiums for the insuring of human lives; that it was issuing insurance policies for hire, upon the lives of individuals; that it was collecting premiums from individuals for the insurance of human lives; that it was making contracts whereby, for a stipulated consideration, it undertook to indemnify individuals against the risks attendant upon the duration of human life; that it was making contracts by which it, in consideration of a sum of money in gross and of periodical payments of stipulated sums of money, undertook to pay money at a time depending upon the death of the person whose life was insured; that it was carrying on and transacting the business of making assurances upon the lives of individuals; that it was transacting the business of a life

insurance company; that it was insuring the lives of the members thereof for the benefit of such members, or for the benefit of the widows, children and legatees of members.

The respondent's return denied the alleged usurpation of powers; denied that respondent was doing a life insurance business; but alleged that it had obtained a certificate of incorporation March 2nd, 1876, as a benevolent society, and that it was nothing else. The return further averred that the occasion for the establishment of this benevolence arose from the fact, that the members of the Merchants' Exchange of St. Louis, their agents, employees and servants, transacting business on the floor of the Exchange, found their limited time for doing business each day upon the floor of said Exchange so frequently impeded and interrupted by importunate and urgent appeals to them for charitable relief, during their busy hour so devoted to aforesaid certain business transactions, for aid to bury some broken merchant or dealer, or former frequenter of said Exchange, or to relieve the widow, family, orphans or dependents of some person admitted to said floor to transact business for members, from destitution and need, that it became necessary to form this benevolent and charitable society, not merely as a means of providing relief for such cases consistent with humanity, but also as a benevolence to the living survivors in saving their valuable time, and remedying the occasion for having the time devoted to active business from being taken up in hearing and deciding upon such applications, to the great loss of their time and interruption of their business; that to meet this constantly recurring exigency the Merchants' Exchange Mutual Benevolent Society was organized, not as an insurance on life, but simply as a means of immediate cash relief, depending not upon the irregular generosity of a few liberal subscribers, but upon a small contribution from each of the former associates of the person in whose behalf charity was invoked; that it carried on all the necessary business

in conducting its affairs in the office of the said Exchange; that the officers and members of said Exchange allowed the entire business of the respondent to be carried on by the employees of said Exchange, at its aforesaid office, without any charge for desk room or rent; that all the trustees and officers of respondent are members of the said Exchange; that for a short time after organizing the society, it admitted from time to time, by the unanimous consent of the trustees, proper persons who were visitors to the Exchange, not to exceed fifty in all; but after learning the decision of the St. Louis court of appeals in the case of *State ex rel.*, *&c., Circuit Attorney v. The Citizens' Benefit Association*, the society had ever since. upon advice of counsel, declined and refused to admit to its membership any person who was not a member of the Merchants' Exchange, or admitted on the floor to do business for members, and having the privileges of the floor; that the society had accumulated a permanent fund of about $7,500, which was invested in United States bonds; that it held no certificate from the insurance department; that it had not paid into the State treasury any fees under section 21, article 10 of the State constitution; that it held no authority to carry on an insurance business from any state, employed no actuary, paid no solicitors, and issued no shares of stock or other evidence of pecuniary profit.

Accompanying the return and forming part of it were the articles of incorporation. These declared the object and purpose of the corporation to be " to give financial aid to the widows and children of deceased members, or to such uses and purposes as such members shall by last will and testament direct. *Provided*, Such aid shall be given: *First*, To the widow. *Second*, If there be no widow, then to the children of such deceased member; but in case such deceased member shall by will direct a division of such aid between such widow and children, then the same shall be distributed accordingly. *Third*, If there are neither widow nor children, then as may have been directed

by the last will and testament of such deceased member. *Fourth,* If there be neither widow, children nor last will and testament of such deceased member, then such aid is to be paid into and be a part of the permanent fund of this society."

The article relating to membership was as follows: "All applicants for membership shall be members of the Merchants' Exchange of St. Louis, or an employee of a member or an officer registered on the books of said Merchants' Exchange, and entitled, under the rules of said Exchange, to the privileges of the floor of said Exchange during business hours; of sound mind and in good health, and between the ages of twenty and sixty years; provided, members may be received in this society when over the age of sixty, or who are not members of the Merchants' Exchange, by the unanimous consent of the board of trustees; and when once a member of this society, the membership shall not cease as long as such member complies with the articles of association and by-laws, though he may have withdrawn and be no longer a member of the Merchants' Exchange, or employee or officer thereof."

Persons desiring to become members were required to sign an application in the following form:

*To the Trustees of the Merchants' Exchange Mutual Benevolent Society of St. Louis:*

The undersigned desires to become a member of your society, and if accepted, agrees to abide by all the laws and regulations now in force, as well as such as may hereafter be adopted for the government of the same:

Name of Applicant————
Post Office Address————
Street and Number————
Where Born————
Date of Birth————
If an Employee, name the Employer————
Occupation————

How long have you been a resident of St. Louis——

How long have you been a member of the Merchants' Exchange, or employee of a member——

I am in good health, and have no chronic disease that will tend to shorten life.  The above statements are true to the best of my knowledge and belief.

——Applicant.

A certificate of membership was granted in the following form: This is to certify that D. H. has been received into and is a member of Class A, in the Merchants' Exchange Mutual Benevolent Society of St. Louis, subject to the rules and regulations now in force, or which may be hereafter adopted; and as such is entitled to all the benefits and privileges provided for and due to members of this society, according to the articles of association and by-laws governing the same.

This was the only evidence given members of their connection with or claim upon the society.

The attorney general, not disputing the facts as alleged, moved for judgment notwithstanding the return.

*J. L. Smith*, Attorney-General, with whom were *Given Campbell* and *Carr & Reynolds* in support of the writ.

1.   The State, under its general power to enact laws for the good government and regulation of the community and the protection of its citizens, has the undoubted right to prescribe the conditions upon which persons, associations or corporations may engage in and conduct the business of insurance.  *State v. Mathews*, 44 Mo. 523; *Slaughter House Cases*, 16 Wall. 62; *Paul v. Virginia*, 8 Wall. 168.  This is a regulation, not a prohibition.  *Nathan v. Louisiana*, 8 How. 73.  The legislature is the exclusive judge of the mode of regulation and terms to be prescribed.  *Munn v. Illinois*, 94 U. S. 133; *Chicago, etc., R. R. v. Iowa*, 94 U. S. 164.  It is obvious from an examination of the insurance laws that neither an individual, nor an association of indi-

viduals, can lawfully engage in the business of insurance without a corporate organization. By the 46th section of the act of 1869, (1 Wag. Stat., § 46, p. 756,) the regulations of the act did not in terms extend to individuals or associations of individuals. But by the act of March 28th, 1874, (Laws 1874, p. 81,) now section 6012, Revised Statutes, individuals and associations of individuals were and are included. This is an answer to the claim that has been made that the corporation does not, but the individual members do insure each other and themselves.

2. Is the business in which the respondent is engaged insurance? Under power conferred by article 8, chapter 37, Wagner's Statutes, to practice benevolence and charity, has it gone beyond the bounds of benevolence, charity, donations, and entered upon the domain of contract? Does its benevolence flow, not from mere good will, but from legal obligation? Is its charity the performance of a mere moral duty which cannot be enforced by the law? Are its gifts bestowed without the least consideration, or do they depend upon mutual promises? Upon the answers to these questions rests the determination of this case. As to what constitutes insurance, we refer to Bunyon Life Insur., (1 Ed.) 17; Bliss Life Insur., § 3; May Insur., § 1; 2 Marshall Insur., 766; *Com. v. Wetherbee*, 105 Mass. 149. There need not be a formal written instrument or policy to evidence the contract. Parsons Merc. Law, §§ 403, 404; Smith's Merc. Law, (Holc. & Gh. Ed) p. 385, note; Bliss Life Ins., § 138; R. S. 1879, § 731; *Henning v. U. S. Ins. Co.*, 47 Mo 426; s. c., 2 Dill. 29; *Kelsall v. Tyler*, 11 Exch. 513.

Admit that defendant may engage in works of benevolence and charity under their articles of association and the organic act. They must, to be within the protection of law, do their works by legal, lawful methods. The prohibitions and regulations of our law are not aimed at the objects of corporations, but at that particular mode of accomplishing such objects by means of insurance contracts.

*Governors, etc., v. Am. Art Union,* 3 Selden 228, 237.   Admit also that insurance is a form of benevolence and charity— that providing for the support of one's children on the death of the parent, as well as guarding against want on the part of helpless dependents, is the highest form of be-- nevolence—yet, even then, societies incorporated under article 8, are not authorized to exercise benevolence and charity by means of insurance contracts.   This for two reasons :  *First,* the words " or any other association or- ganized for benevolent or charitable purposes," must be construed, under the canon *ejusdem generis,* to refer to societies like Masons, Odd Fellows, Sons of Temperance and Patrons of Husbandry, whose objects, being benevo- lent, are well understood not to be carried on by means of any contracts partaking of the characteristics of insurance contracts.   Green's Brice's *Ultra Vires,* p. 54, note 1.   *Sec- ond,* If these words had a more extended meaning, the effect would be to let in and include societies which were not within the words of the act, and there would be no convenient limit, and insurance and numerous other socie- ties would be included.   Ibid.   Organized under article 8, all insurance companies, taking advantage of the 21st sec- tion, of article 10 of our constitution, would escape not only the police regulations of the State, but the payment of taxes, fees and other revenues necessary to the State.

All insurance was originally based on the idea of be- nevolence.   3 Kent, § 366; 2 Marsh. Ins. p. 766.   If, then, defendants are exercising charity and benevolence by means of contracts for the payment of money upon the death of a member, they are doing an insurance business.   It mat- ters not how those contracts are evidenced, what name is given to them, whether evidenced by a certificate of mem- bership, or the provisions of the articles of association, by by-laws, or by rules adopted by the society, courts will look at what the business and the mode of doing it actu- ally is, and, irrespective of forms or names, or evasive and cunningly promulgated motives, the argus eyes of justice

will penetrate all these and look at the substance of the thing itself.

The only mode in which the society exercises its benevolence is on the death of a member, "to pay to the widow, children or legatee of decedent the sum of $1, if a member of class A, for each member of that class; $2 if a member of class B, for each member of that class; $3 if a member of class C, for each member of that class, and $4 if a member of class D, for each member of that class." Art. 14 of By-Laws. All the other provisions of the articles of association and by-laws relate to the mode of collecting the assessments and initiation fees, and to the terms upon which members are admitted, except that sections 15 and 16 provide for the collection, distribution and investment of a contingent and permanent fund, the object of which is to make up deficiencies in collections and ultimately do away with their necessity. Article 13 in terms makes the application for membership part of the contract of membership, and requires the member to remain a temperate man and to abstain from habitual drunkenness, while article 1 prescribes the initiation fees and requires medical examinations. Article 14 does not limit the payment on death of a member to the sum collected, but the corporation undertakes, in consideration of the payment of a sum certain at the start (the initiation fee) and of the periodical payment of a certain sum (regulated according to the class and age of the member), upon the death of a member of the class to which he belongs, to pay a certain sum (so many dollars for every member in the class) upon a certain event (death) to a certain person (widow, children or devisee). True, this is not all set out in the certificate of membership, but the certificate, simple as it is, and the mere fact of membership as effectually make all the by-laws of defendant a part of the contract of membership as if set out *in hæc verba*. *Schunck's Case*, 44 Wis. 372.

The applicant is required to answer and subscribe the

questions propounded in the blank form (Art. 1 By-Laws);
he agrees to abide by and be governed by all laws and regu-
lations in his application, and by every possible guarantee
and safeguard, the membership is made contingent upon
the performance of the obligations of the by-laws. (See
By-Laws, arts. 1, 13, 14, 15, 16, 18 and 19.) It did not
necessarily follow that the aid provided to be given by sec-
tion 1 of articles of association should be by the proceeds of
insurance upon the life of a member, but the society by its
by-laws has confined itself to that one single mode.

That respondent is doing an insurance business, see
*Hornby v. Close*, L. R. 2 Q. B. 153; *Ill. Masons' Ben. Society
v. Booth*, (by Drummond, J.,) 12 Chic. Leg. News 151; *Ill.
Masons' Ben. Society v. Winthrop*, 85 Ill. 537; *Ill. Masons'
Ben. Society v. Baldwin*, 86 Ill. 479; *Kentucky Mas. Mut. L.
Ins. Co. v. Miller*, 13 Bush 489; *Com. v. Wetherbee*, 105 Mass.
149; *Dietrich v. Mad. Relief Assoc.*, 45 Wis. 79; *Schunck v.
Gegenseiter, etc.*, 44 Wis. 369; *Commercial League v. The Peo-
ple*, 90 Ill. 166.

3. Respondent acquired no rights under the act of
March 8th, 1879, because that act was repealed before it
ever took effect, by the act of May 19th, 1879. Having
been passed without an emergency clause, it could not take
effect until ninety days after the legislature adjourned; but
before that time had expired the act of May 19th was
passed. This act from its title and purview clearly intends
to lay down the law completely as to the establishment,
powers and franchises of benevolent associations, and its
last section in express terms repeals all inconsistent acts.
*Connor v. Chicago, etc., R. R.*, 59 Mo. 292; Sedgwick on
Construction, 62, 124, 125, 359; *Daviess v. Fairbairn*, 3
How. 636; Dwarris on Statutes, 155, 515; *Dean of Ely v.
Bliss*, 5 Beav. 574; *Key v. Goodwin*, 4 Moore & Payne 351;
Smith on Construction, § 762; *Butler v. Palmer*, 1 Hill
324.

*Broadhead, Slayback & Haeussler* for respondent.

Pecuniary profit does not enter at all into the plan, purposes, objects or practical workings of the society. It was formed and has been conducted strictly as a benevolence. There are no stockholders, no dividends, no periodical assessments, no salaried officers, no paid solicitors, and no benefits except the voluntary contribution of $1.10, which each member pays upon the death of a member, in aid of the widow or family or legatee of such decedent member, and in the event such decedent member has no widow, children, or dependent or legatee, then this contribution goes to the establishment of a permanent fund for carrying out the benevolent objects of the society. The misfortunes to which commercial traders are so proverbially exposed rendered appeals such as those referred to in the return peculiarly binding upon a society of merchants and traders, and while they could not have the hardness of heart to ignore these appeals, the loss of time and the interruption of business were very serious impediments. Hence the establishment of this society. It issues no policy; no formal application, such as all insurance companies require, is necessary; the trustees merely exercise such scrutiny as to prevent imposition upon the members who constitute the main body. Only about thirty-one members have joined class B. None at all C or D. There are about 1,200 in class A, in which class no medical examination is demanded, the only instances where the trustees have required it being to prevent imposition. A person does not have to show that he is an available risk in life insurance companies, in order to join this benevolent society. This of itself shows that active benevolence, and not the establishment of an insurance company, is the foundation of this society. The certificate of membership is not a contract of insurance. The application for membership is not in the form of applications for insurance. There

are no proofs of loss required, such as the insurance companies must all require. The tenure of membership does not depend upon the lapse of time, and the payment of periodical assessments or dues. Hence, the society does not directly or indirectly insure the continuance of life. Its only undertaking is that its members will each contribute a certain sum ($1.10) to the widow, family or dependents of the person who sees fit to join the society. A policy of life insurance always purports to insure the continuance of life, for a certain length of time, for money. The contract in the case at bar, when condensed, is simply this : that, in consideration of a certain aid being extended by a member to the family of a decedent member, his own family will be similarly relieved in the event of his own death. But no time is bargained for, and hence the duration of the life of the contributor is not an element in the contract.

In all of these particulars the respondent here differs from the respondent in the case of the *State ex rel. v. The Citizens Benefit Association*, 6 Mo. App. 162; *s. c.*, 6 Cent. Law Jour. 491.

Both this case and the acts of the legislature of March 8th and May 19th, 1879, draw a clear distinction between life insurance companies and those companies which provide mutual aid for members' widows, orphans or dependents. There is here no contract of insurance, but merely a compact for the extending of mutual aid to a decedent's family by the survivors. The mere agent or trustee through whom such compact is carried out, without compensation, cannot be considered an insurer in any sense, or within any accepted definition of the word. This society is merely such trustee.

That each member may expect at some time to reap a benefit through his surviving representatives, is no objection. What is freely given to charity often has a promise of future reward connected with it.

That the mortality tables and the ages of members

applicant are taken into account in the regulating of fees for admission, is no more than every such charity is compelled to observe in order to sustain itself. The occasion for relief is more likely to arise in case of the old or the sick, than the youthful and healthy. This does not constitute the society an insurance company. To hold that would be to say the members shall not deal equitably with each other.

NAPTON, J.—Two points arise is this case, both of which have been fully discussed at the bar. The first question is, whether this company or corporation defendant is doing and authorized by its constitution to do an insurance business, and the second point is based upon an assumption that though it may be so authorized and so employed it is still not within the statute laws in regard to insurance companies, but expressly exempted by the legislature from any such obligation to comply with the general law on the subject of insurance. The first question seems to be of easy solution, whether regarded in reference to the definition of insurance adopted by the text-books or to specific judicial decision.

The origin of life insurance, as we are told by all writers on the subject, is traceable to benevolent motives. 1. INSURANCE: a benevolent society held an insurance company. The object was to secure to the family of a person who was dependent on a salary, or other income which ceased with his life, a support upon the death of the insured, by a small contribution of the annual income, and this, it is apparent, was a laudable and benevolent object. In France, we are told, life insurance was in early times prohibited, on the ground that it might operate as an incentive to those who would benefit by the termination of a life to hasten such termination ; but in England it was adopted by the judiciary long before its sanction by parliament upon an assumption, not unusual with those islanders, of a superiority in popular morals over their continental neighbors. And in this coun-

try it followed the common law of England into such states as adopted that system, but has been so entirely regulated by special legislation here, and probably in all other states, that any reference to its original character becomes unnecessary.

The definition given by Bunyon, an English writer on the subject, is probably as complete as any to be found in the text-books. He defines life insurance to be "that in which one party agrees to pay a given sum upon the happening of a particular event consequent upon the duration of human life in consideration of the immediate payment of a smaller sum or certain equivalent periodical payments by another." The supreme court of Massachusetts defined it to be "a contract by which one party promises to make a certain payment upon the destruction or injury of something in which the other party has an interest, whatever may be the terms of payment of the consideration or the mode of estimating or securing payment of the sum to be assured in case of loss." This definition of the Massachusetts court was given in a case in which the facts were identical, substantially, with the one we now have under consideration. The only question in that case was, whether the charter of a company called the " Connecticut Mutual Benefit Company," was in effect a life insurance corporation. The name of the company was the "Connecticut Mutual Benefit Company," and its constitution recited its object to be "mutual benefit and relief in case of death as hereinafter set forth." The affairs of the company were intrusted to a board of directors, and its officers were a president, secretary, treasurer, etc. The funds of the company were raised by admission fees of members and assessments as prescribed in the by-laws. The rate of fees was fixed according to certain enumerated classes, and those who paid the largest premiums were entitled to a proportionate increase of dividends.

In the case we have under consideration the title of the corporation is "Merchants' Exchange Mutual Benevo-

lent Society of St. Louis," the words "mutual benefit" being exchanged for "mutual benevolent." The object stated in the constitution of the society is "to give financial aid to the widows and children of deceased members, or to such uses and purposes as such member shall by his last will and testament direct." The election of nine trustees was provided for, and the appointment of the necessary officers of president, secretary and treasurer. The funds were raised by initiation fees, and classes were arranged as in the Connecticut charter. In short, it is impossible to see any material difference in the two schemes. The opinion of the court was that the corporation or association was an insurance company, and came within the meaning of the Massachusetts statute.

I am not satisfied that I could express the views of this court on the first point in the present case in a more condensed, comprehensive or pointed form than will be done by simply employing the language of the Massachusetts supreme court : "The contract made between the Connecticut Mutual Benefit Company," says Judge Gray, who delivered the opinion of the court, "and each of the members, by the certificate of membership issued according to its charter, does not differ in any essential particular of form or substance from an ordinary policy of life insurance. The subject insured is the life of a member. The risk insured is death from any cause not excepted in the terms of the contract. The assured pays a sum fixed by the directors, and not exceeding $10, at the inception of the contract, and assessments of $2 each annually, and of $1 each upon the death of any member of the division to which he belongs, during the continuance of the risk. In case of the death of the assured by a peril insured against, the company absolutely promises to pay to his representatives, in sixty days after receiving satisfactory notice and proof of his death, as many dollars as there are members in the same division, the number of which is limited to five thousand. The payment of this sum is limited to no

contingency but the insolvency of the corporation. The means of paying it are derived from the assessments collected upon his death from other members, from the money received upon issuing other certificates of membership, which the by-laws declare may, after payment of expenses, be 'used to cover losses caused by the delinquencies' of members and from the guarantee fund of $100,000 established by the corporation under its charter.' This is not the less a contract of mutual insurance upon the life of the insured, because the amount to be paid by the corporation is not a gross sum, but a sum graduated by the number of members holding similar contracts, nor because a portion of the premiums is to be paid upon the uncertain periods of the deaths of such members, nor because, in case of non-payment of assessments by any member, the contract provides no means of enforcing payment thereof, but merely declares the contract to be at an end, and all moneys previously paid by the assured, and all dividends and credits accruing to him, to be forfeited to the company. The fact offered to be proven by the defendant that the object of the organization was benevolent and not speculative, has no bearing upon the nature and effect of the business conducted and the contract made by the corporation." *Com. v. Wetherbee*, 105 Mass. 160.

In the constitution of the present society, it is true that no guarantee fund of $100,000 is provided for, but by reference to artice 15 of the by-laws, it will be seen that a similar fund, though called by a different name, is provided for. That article is as follows: "Article 15. The entrance or initiation fee shall belong to and be invested as a permanent fund, each of the classes being kept separate on the books of the society; provided that the board of trustees are authorized to employ, from time to time, as they in their discretion may deem best, one or more persons to act as solicitors for the purpose of obtaining members to this society, and to pay such solicitor for his services out of the permanent fund, not to exceed the sum of $1 for each

member so obtained.    The interest on the permanent fund, with the amount assessed against each member on the death of a fellow member, together with all gifts or income received by the society, shall be placed to the credit of the contingent fund and used for advances for members in anticipating their dues on the death of a fellow member, defraying the current expenses of the society as may be directed by the board of trustees; but if at any time the contingent fund shall exceed the wants of the society for the purpose named, the trustees shall order the same to be invested in bonds."

This opinion of the supreme court of Massachusetts, if it be a sound one, would seem to be quite conclusive on the first point discussed in this case, but as the opposite view has been maintained with much confidence in the argument of counsel for the defendant, it may be proper to show, by the decisions of other courts, that it has been generally acquiesced in; indeed, I may say, uniformly adopted where there were no legislative enactments requiring a contrary construction. The case of *Schunk v. Gegenseitiger Wittwen und Waisen Fund*, 44 Wis. 370, is merely an assumption on the part of counsel on both sides, in which the court concurred, that the corporation defendant was a mutual insurance company. The name as translated from the German wa sthe Mutual Widows' and Orphans' Fund. It was a corporation organized and acting by the authority of the Grand Lodge of the United Ancient Order of Druids. The grand lodge consisted of representatives from the several groves, which, together with the association, were under the jurisdiction of the grand lodge, and the court declared that the defendant "was obviously organized to answer the ends or serve the purpose of a mutual life insurance company." The description given by the court of the character and operations of the company, with unimportant changes as to details, would apply to the corporation defendant here. "Among the provisions of the constitution and by-laws adopted for its management," says Cole, J.,

" is one which provides that, on the death of a member in good standing, there shall be paid to his surviving widow or heirs the sum of $800 as life insurance.  The funds under the control of defendant are made up chiefly of dues paid by members on admission into the order and assessments levied upon and paid by the members on the death of a brother.  The managing authority of the defendant is termed a directory, which is chosen by the groves from their members, each grove that has not more than seventy-five members being entitled to one member in the directory and to an additional member for each additional seventy-five or fraction exceeding one-half that number.  This directory conducts the whole management of the defendant; fixes the amount of the assessment to be paid by the members on notice of the death of a brother, issues, through its corresponding secretary, to all the groves a demand of payment of such assessment; and also determines whether the claims of the survivors of the deceased are just.  Every member of a grove is obliged to contribute to the fund by paying his initiation fee and assessments, and is entitled to participate in its benefits.  The admission fees and assessments are paid by the members to their respective groves, the grove paying over all dues to the directory."  The point decided in the case has no connection with the present question under consideration, but it is an answer to the position taken in this case, and somewhat urged in argument, that there was no contract provided for by the constitution and by-laws of the present society; that the officers were merely collecting agents and their performance of such voluntary duties could not be enforced.  The court held that the groves were a part of the machinery of the corporation for collecting assessments, and were as much agents of the corporation as of the members paying, and their neglect to pay over the money collected could not affect the representatives of the deceased member, but that the corporation was liable, and judgment was accordingly given against it.

In *Erdmann v. The Mutual Ins. Co. of the Order of Her-mann's Sons of Wisconsin*, 44 Wis. 376, the title of the company sufficiently indicates its character, but the machinery for collection and contribution and distribution seems to have been essentially the same as in the case just referred to. In *Dietrich v. Madison Relief Association*, 45 Wis. 79, we have another corporation of the same class and managed in the same way. No question was made as to its being a mutual life insurance company. In a recent case in Kentucky (13 Bush 489) the same doctrine is recognized without question. So in *Masons' Benevolent Society v. Winthrop*, 85 Ill. 537, there was no question raised as to the corporation being an insurance company, but a statement of the case shows no essential difference between it and the benevolent society which is defendant here. The covenant which was sued on consisted of a promise or agreement by the society to pay to the wife of the deceased member, on satisfactory proof of his death, a certain sum of money depending on the class of which he was a member. The court says: "The organization is a kind of mutual benefit association, managed by a directory, and the expenses and losses of the society are paid by assessments made upon the members for such purposes." The court declares the certificate of membership "in the nature of a policy of insurance on the life of the member." In the *Illinois Masons' Benevolent Society v. Baldwin*, 86 Ill. 479, the corporation was treated by the court without question, so far as it appears, as an insurance company.

A decision of the court of appeals of New York, affirming one of the supreme court, has been referred to, though not on the subject of insurance, but to show how little importance is attached by the judiciary of that state to names or ostensible objects of association, when their organization and real effect is in conflict with a law and the constitution of the state. In the case of the *Governors of the Alms House, etc., v. The American Art Union*, 3 Selden 228, the corporation was professedly devoted to the

encouragement and promotion of the fine arts, and the works of art purchased were distributed every year among the members by lot. The constitution of the state had this provision: "No lottery shall hereafter be authorized in this state, and the legislature shall pass laws to prevent the sale of lottery tickets within this state, except," etc. There was also a statute which provided that "no person should set up or propose any money, goods or chattels or things in action to be raffled for or to be distributed by lot or chance to any person who shall have paid or contracted to pay any valuable consideration for the chance of obtaining any such money, goods or things in action." Notwithstanding the ingenious argument of Mr. O'Conor, that the term lottery used in the constitution was not designed to apply to games of chance where no skill on the part of the player is required, nor to any schemes where the object was not to raise public revenue, the court, with only a single dissenting voice among the eight judges, did not hesitate to declare the scheme within the constitutional prohibition as well as that of the statute.

The case of the *Commercial League Association of America v. The People*, 90 Ill. 166, has been referred to as conflicting with these decisions, but it cannot be so considered. That company was conceded to be an insurance company, but it was held exempt from the general statutes regulating insurance because of a special exemption in a special statute. We have no such statute here, but we have statutes which are claimed to have the same effect, and this leads us to a consideration of the second point.

Assuming defendant to be a mutual insurance company, it is claimed that our legislation in regard to corporations which are termed benevolent associations, and especially article 10, contains provisions which expressly exempt the defendant from the provisions of the general law in regard to insurance. This point is not without difficulties arising from the very peculiar history of our recent legislation.

2. BENEVOLENT SOCIETIES, WHEN SUBJECT TO THE INSURANCE LAWS.

On the 8th of March, 1879, the following statute was passed: " Section 1. That chapter 70 of the General Statutes of Missouri, being article 8 of chapter 37 of Wagner's Statutes of Missouri, relating to benevolent, religious and educational associations, is hereby amended by adding the following sections thereto, to wit: Section 14. The associations and societies of the character referred to and mentioned in the first section of this act may also include in their corporate powers the privilege for (of) providing for the relief and aid of the families, widows, orphans or other dependents of their deceased members, or for assisting such as may be sick or disabled, from the proceeds of assessments upon the members of such society or association. Section 15. Any such society or association heretofore or hereafter incorporated under the provisions of this act may avail itself of the benefits of the foregoing section by amendment to its constitution or articles of association in the manner prescribed by this act. All such societies or associations are hereby declared exempt from the operation of the General Statutes of this State in regard to insurance companies." Acts 1879, p. 65.

On the 19th day of May, 1879, another act was passed entitled "An act to provide for the incorporation of benevolent, religious, scientific and educational associations and of miscellaneous associations." The first section is not materially different from the corresponding section in the revised code of 1865, as found in Wagner's digest, page 339. The third section is as follows: "Any association formed for benevolent purposes, including any purely charitable society, hospital, asylum, house of refuge, reformatory and eleemosynary institution; any association whose object is to promote temperance or other virtue conducive to the well being of the community, and generally, any association formed to provide for some good in the order of benevolence that is useful to the public, may become a body corporate and politic under this act, and incidentally such association may provide means wherewith to assist its

sick or disabled members, or relieve or aid the families, widows, orphans or other dependents of its members who may die, without being thereby subjected to the operation of the General Statutes of this State relating to life insurance; provided, that nothing herein contained shall be construed to authorize any association formed hereunder to insure the life of any member thereof for his own benefit or that of any other person." The concluding section of this act contains the following clause: "Section 14. All acts and parts of acts inconsistent with this act, are hereby repealed; provided, that nothing in this section shall prejudice the rights of any existing corporation whatever." Acts 1879, p. 66.

The revisors included both these acts in the Revision —the first as sections 972 and 973; the second as part of section 974; but omitted the repealing clause of the last act. They probably acted upon the opinion that it was not their province but that of the courts to determine upon the compatibility of the two acts, and, therefore, inserted both.

Whether the act of 8th of March would have exempted the corporation defendant in this case from the operation of the General Statutes concerning insurance companies, we deem it unnecessary to determine, since the act of the 19th day of May, if it did not operate as a repeal of the former act, undoubtedly so modified it as to exclude the defendant from its operation. The charter of defendant constitutes life insurance the main, indeed, the only business of the company. It is not incidental to some other form of benevolence in which aid is extended to bereaved widows or orphans, but, as has been shown, practically exhibits benevolence in the same way it is promoted by all life insurance companies. In plain terms, the two acts are irreconcilable—the one aiming to relieve those benevolent associations from the burthens imposed on mutual insurance companies, the other designing and in terms declaring that they are not so exempt. They were obviously

brought about by different and opposite interests and from different and opposite motives. They were framed *diversa intentia*. It is unnecessary to cite authorities to show that the last act must govern, though passed by the same legislature and at the same session. What was meant by the proviso to the repealing clause of the act of May 19th, I confess myself unable to conjecture. It has been suggested that it might apply to a company organized between the 8th day of March and the 19th day of May, but it is unnecessary to determine the plausibility of such a conjecture since the defendant was not in that condition. Previous to the session of 1879, no such provision in regard to benevolent associations as were inserted in the act of March 8th was to be found in our statutes. 1 Wag. Stat., Title Corporations, art. 8, p. 339. This act is the sole reliance for any claim of exemption, and being of opinion that the act was repealed or so essentially modified as to prevent any such effect, a judgment of ouster necessarily follows. The other judges concur.