## DRUM *v.* BENTON.

LIFE INSURANCE; MUTUAL BENEFIT ASSOCIATIONS; CONTRACTS; CHECKS; NOTICE.

1. The constitution and by-laws of a mutual benefit association and the certificate of membership in which the party to whom it is issued agrees to conform to such constitution and by-laws, constitute the contract and determine the rights of the member, and the rights thus defined and prescribed are to be enforced according to the terms of the contract and not otherwise.
2. Where the by-laws of such an association provide that a member who shall fail to pay any of his assessments thirty days after the same may be due shall be notified, and if he shall be in

arrears thirty days longer he shall be dropped, time is of the essence of the contract.

3. And where a member of such an association, after notification of his default in the payment of an assessment, mails a check for the sum due to the secretary of the association, but before the check is used telegraphs to the secretary to hold the check until he is heard from, and nothing further is heard from him, he may legally be dropped from membership in the association after the lapse of the period for payment prescribed by the by-laws.

4. Under such circumstances, the secretary of the association receives the check as agent of the drawer, subject to his future order as to its disposition, and not in payment of dues.

5. Subsequent tender of the check by the beneficiary of the member after his death, and after the expiration of the time limited for payment of the assessment, can not avail to reinstate to membership the decedent as of the time of his death, or aid her claim against the association in any manner.

6. If the drawer of a check, or other negotiable instrument, die before its delivery to and acceptance by the payee, it becomes a nullity and can not be delivered by his representatives.

7. No other notice to a member of a mutual benefit association, who is in default in the payment of his dues, is necessary than that prescribed by the by-laws of the association to which he has agreed to conform.

No. 791. Submitted May 19, 1898. Decided October 3, 1898.

HEARING on an appeal by the defendants from a decree in a suit by the beneficiary named in a certificate of membership in a mutual benefit association, to have the deceased member reinstated as of the time of his death, and for payment to her of the amount of the benefit. *Reversed.*

The facts are sufficiently stated in the opinion.

*Mr. J. N. Morrison, Mr. R. Ross Perry,* and *Mr. R. Ross Perry, Jr.,* for the appellants:

1. In dealing with the rights of members, as members of the organization in its character of a mutual life insurance company, the courts are to confine themselves strictly to the terms of the contract which the members have made among themselves. The forfeiture of the insurance depends on the contract between the insuring organization and the

insured member, to wit, the constitution and by-laws viewed as one contract. Bacon, Benefit Societies and Life Insurance, Sec. 352, 354, and cases cited; Encyc. of L., Vol. 16, p. 81; Niblack on Mutual Benefit Societies, pp. 336, 337; *Id.* pp. 330, 331, and cases cited.

2. The real agreement and understanding of the parties to the contract in this case, on this subject of forfeiture of insurance by the failure on the part of a member to pay his dues within the time fixed, was that a failure to pay the dues within the time fixed was to operate as a forfeiture, unless the executive committee took affirmative action purporting to "retain him in membership for a reasonable period thereafter" on the ground that they were "convinced that his failure to pay is due to the interruption of mail communications or other cause without his fault."

The condition that the executive committee may retain a member for a reasonable period who has failed to pay within the time fixed makes it proper for the secretary to lay before that body the case of each one who fails to pay, and give it an opportunity to retain him if the circumstances warrant his retention. And it is sufficient if the committee simply refrains from retaining him, and to decide that he be dropped is equivalent to doing this. The action in dropping him is important as showing that the committee did not exercise its power to retain him. Besides, the direction in the by-laws is that when he shall have failed to pay he shall be dropped, *i. e.*, when he shall have suffered a forfeiture by the fact of failing to pay, the officers of the association shall drop his name from the books and lists, etc. Therefore, when a case is laid before the executive committee, they either affirmatively retain him for a reasonable period, or they direct that his name be dropped. Under the general powers given this committee by Section 2 of the by-laws, it would seem that it is the proper body to do this. The forfeiture would be valid and effective without any actual dropping of his name at all. *Rood* v. *Ben. Asso.*, 31 F.

R. 62; *Yoe* v. *Mut. Benevolent Assn.,* 63 Md. 86; *Ben. Society* v. *Baldwin,* 86 Ill. 479; *Madeira* v. *Ben. Society,* 16 F. R. 749; *Zeigler* v. *Ins. Co.,* 1 McGloin (La.), 284. The practice of this association during its whole existence shows that the members have always understood their agreement to be as claimed above, and it is evident that Benton so understood it. The evidence shows that he believed that he had forfeited his membership.

2. The circumstances of the sending of the check and telegram, and of the holding and returning of same, etc., did not amount to, and were in no sense equivalent in law to a payment, in view of the facts, first, that Rittenhouse, the holder of the check, and to whom the check and telegram were sent, became the agent of the drawer for the purpose of collecting the money from the bank (Law of Bank Checks, Van Schaack, 164, and authorities cited), and was further made the agent of Benton by the telegram being sent to him directing him to hold it until heard from; and, second, that while Rittenhouse so held the check, as directed by Benton, Benton drew all of his money out of the bank by means of other checks. A drawer of a check can not be heard to complain that his check was not presented when there are no funds in bank with which to pay it. The drawer may extend time for payment, and if in the meantime he withdraws his funds presentment is not necessary to charge him. 3 Am. & Eng. Encyc. of L., 212, 213, 216; Benjamin's Chalmers' Digest, Article 168; 2 Dan. Neg. Inst. (3d Ed.) Sec. 1596.

A check amounts to payment only when cashed, unless it is agreed that it shall be absolute payment, or the negligence of the holder in not presenting it causes loss of the fund through failure of the bank (not some other loss) to the drawer. *Bradford* v. *Fox,* 38 N. Y. 289; Daniel (3d Ed.), Sec. 1623. And Rittenhouse testifies that this check was not accepted as either an absolute or a conditional payment, or payment at all, either by him or by the association.

There was, therefore, no express or implied agreement that the check should itself be payment, either absolute or conditional.

3. Where the contract provides that the fact of non-payment shall itself operate a forfeiture, it does so operate, and no further action on the part of the company is required. *Borgraefe* v. *Supreme Lodge*, 22 Mo. App. 127 ; *Hansen* v. *Supreme Lodge*, 40 Ill. App. 216; *Grand Lodge* v. *Besterfield*, 37 Ill. App. 522; *Ben. Assn.* v. *Baldwin*, 86 Ill. 479 ; *Rood* v. *Ben. Assn.*, 31 F. R. 62; *Yoe* v. *Ben. Assn.*, 63 Md. 87; *Blanchard* v. *Ins. Co.*, 33 N. H. 9; *McDonald* v. *Ross-Lewin,* 29 Hun, 87; *Madeira* v. *Ben. Assn.*, 5 McCrary (U. S.), 258. In many of the above cited cases there was a provision that a member might be reinstated by the action of a designated body of the association.   It has always been held that such a provision did not defeat or affect the clause relating to suspension or expulsion.   Of course if the provisions of the constitution or by-laws are merely permissive, there must be some action of the governing body.   So, if procedure is adopted which implies a hearing, both parties have a right to be heard before there can be a forfeiture.   It was under such provisions that the cases of *Olmstead* v. *Ins. Co.*, 50 Mich. 200, and *Chamberlain* v. *Lincoln*, 129 Mass. 70, were decided.

*Messrs. Webb & Webb* for the appellee:

1. The mutual rights of members of both incorporated and unincorporated societies depend upon the constitution and by-laws, which have the effect of a contract, whose provisions are equally binding upon all.   *Brown* v. *Stoerkel*, 3 L. R. A. 433 ; Am. & Eng. Encyc. of L., 2 Vol., 172, n. 2 ; Bacon on Benefit Societies, Secs. 37, 91, 116; *Hyde* v. *Wood*, 94 U. S. 523.   Courts of equity have jurisdiction over unincorporated, voluntary associations where pecuniary rights of the members are involved.   *Hammerstein* v. *Parsons*, 38 Mo. App. 332; *Van Houten* v. *Pine*, 38 N. J. Eq. 72.

The contention of the appellee is: (1) That the attempt
to drop James W. Benton from the Army Mutual Aid Asso-
ciation and forfeiture of his membership was illegal, null
and void.    (2) That he never ceased to be a member of the
said association, and was such at the time of his death.
(3) His beneficiary is entitled to benefits.    The principle
of law mainly relied upon is, that forfeitures are not favored
in the law, and courts are always prompt to seize hold of
any circumstances that indicate an election to waive a for-
feiture, or an agreement to do so, upon which the other
party has relied and acted.    *Van Bakkelen* v. *Benefit Assn.,*
90 Hun, 330; *Greenwald* v. *Insurance Co.,* 42 N. Y. Sup.
978–79; *Insurance Co.* v. *Eggleston,* 96 U. S. 577; *Insur-
ance Co.* v. *Norton,* 96 U. S. 242; *Gunther* v. *Aid Assn.,*
2 L. R. A. 118.

The reason for the forfeiture of Benton's membership
and his being dropped from the association is that his dues
were not paid in obedience to the requirements of Article 12
of the by-laws.    Are there any circumstances in this case
which indicate an intention on the part of the association to
waive a strict compliance with the requirements of this arti-
cle?    Several of Benton's previous assessments which had
remained for a long time unpresented at bank for payment,
were nevertheless received as satisfactory payments.    This
apparent condonation would of itself be enough to make
him believe that great promptness would not be exacted
from him.    There can be no question in regard to Benton's
intention to pay his dues.    Had he not intended to pay
them, it would have been a simple matter to have ignored
the notice and sent no check.    See *Greenwald* v. *Ins. Assn.,*
42 N. Y. Sup. 978.    This check was never presented for
payment by the treasurer of the association and Benton was
dropped for non-payment of his dues, while his check drawn
for the full amount of his dues for the coming year was in
the treasurer's hands.    This check should have been pre-
sented at bank for payment before any action could have

been properly taken towards the forfeiture of Benton's membership for non-payment of dues.  *McIntyre* v. *Kennedy,* 29 Pa. St. 450; *Bradford* v. *Fox,* 38 N. Y. 289; *Stevens* v. *Park,* 73 Ill. 387; *Pollard* v. *Bowen,* 57 Ind. 235; *Griffin* v. *Kemp,* 46 Ind. 172.  The action of the executive committee resulted in injury to Benton, and such action was illegal and void, until the check had been presented at bank for payment and had been refused.

2. The reason assigned for the forfeiture of Benton's membership, and the non-presentation of his check, was the telegram of June 1, 1896.  This telegram meant simply that Benton asked for an extension of time in which to pay his dues, and can not be twisted into a refusal to pay his dues.  This request was granted.  By this action it can be reasonably supposed that Benton was led to expect indulgence, and was lulled into the security that nothing would be done until he was heard from, or without notice to him. *Thompson* v. *Ins. Co.,* 136 U. S. 299; *Mickey* v. *Burlington Ins. Co.,* 35 Iowa, 174; *Horner* v. *Ins. Co.,* 67 N. Y. 478; *Union* v. *Whitt,* 36 Kan. 760; *Howell* v. *Knickerbocker,* 44 N. Y. 276; *Marck* v. *Supreme Lodge,* 29 F. R. 896.  Benton had the right to expect that the executive committee should present his check for payment, and, if refused payment, give him a chance to make it good, or that it would ask him to explain what he meant by his telegram, before forfeiting his membership.  But neither was done.  The executive committee failed in its duty and is estopped from insisting upon the forfeiture.  *Sweetser* v. *Association,* 117 Ind. 97; *Stylow* v. *Odd Fellows,* 19 Am. & Eng. Corp. Cases, 33; *Insurance Co.* v. *French,* 30 Ohio St. 240 ; *Helme* v. *Insurance Co.,* 61 Pa. St. 107; *Hanley* v. *Insurance Co.,* 69 Mo. 380.

This association is not a social organization and Benton had property rights in it, which could not be taken away from him in this arbitrary and high-handed manner.  He was entitled to a hearing and an opportunity to defend himself.  *Watchell* v. *Widow's Society,* 84 N. Y. 28; *Fritz* v.

*Muck,* 62 How. Pr. 69 ; *Osterman* v. *District Lodge,* 43 Pac. R. 412; *Manning* v. *Klein,* 1 Super. Ch. (Pa.) 218 ; *Von Ark* v. *Greutli Verein,* 45 Pac. R. 685 ; *Olmstead* v. *Ins. Co.* 50 Mich. 200 ; *Loubat* v. *Le Roy,* 15 Abb. New Cases, 19.

Had he been notified that his check would be presented for payment on a day certain and it had been so presented and not paid, the executive committee would have some ground upon which to base its action, but under the circumstances it has none. "The holder of a check on a bank can not resort to the drawer, without proof of a due presentation to the drawee for payment and prompt notice of dishonor." *Case* v. *Morris,* 31 Pa. St. 100 ; *Little* v. *Bank,* 2 Hill (N. Y.) 430. Applying this principle to the case at bar, we maintain that the executive committee was estopped from declaring a forfeiture of Benton's membership, until it had presented his check at the bank, and it had been refused payment.

If Benton, when he received the notice of July 6, 1896, had sent the check back to the treasurer with an explanation that his telegram had been misunderstood, and that he did not intend not to pay his dues, he could have compelled the executive committee to reinstate him. *Bradley* v. *Mutual, etc., Assn.,* 31 Atl. R. 775; *Dennis* v. *Benefit Assn.,* 120 N. Y. 496; *Wheeler* v. *Ins. Co.,* 82 N. Y. 543–4; *Lavelle* v. *Societe,* 16 L. R. A. 392. This principle is applicable to that part of Section 12 of the by-laws, which provides that the executive committee shall retain a member, if his failure shall be due to the interruption of mail communication or to other cause without his fault for a reasonable time thereafter.

3. Benton's failure to open the letter of July 6, 1896, while careless, is of no special importance to the issues in this cause. He never knew of this action of the executive committee, and can not be said to have acquiesced in it. *Hoeffner* v. *Grand Lodge,* 41 Mo. App. 367 ; *Mulvory* v. *Supreme Council,* 28 Mo. App. 463; *Glardon* v. *Supreme Lodge,* 50 Mo. App. 45.

4. Benton's membership was illegally forfeited. The mere failure to pay his dues within the time prescribed did not of itself work a forfeiture of his membership. In order to effect this the action of the body, duly empowered by the constitution and by-laws to expel members from the association, was necessary. The executive committee did not possess this power and consequently its action was void. *Green* v. *Society*, 1 S. & R. 254; *State* v. *Chamber of Commerce*, 20 Wis. 68, 77; *Independent Order* v. *Zak*, 136 Ill. 189; *Grand Lodge* v. *Menken*, 67 Ill. App. 576; Niblack on Mutual Benefit Societies, Secs. 67, 70; Bacon on Benefit Societies, Sec. 100; *Meads* v. *Alpha Lodge,* 35 N. Y. Sup. 214.

Mr. Chief Justice ALVEY delivered the opinion of the Court:

The bill in this case was filed by the appellee, Mrs. Sarah H. Benton, widow of James W. Benton, deceased, against the appellants, the officers and representatives of the Army Mutual Aid Association, an unincorporated association having its place of business in the City of Washington, for the purpose of having reinstated to membership of the association her deceased husband at the time of his death, and of having decreed against the defendants, representing the association, the benefits alleged to be due her, as beneficiary appointed by her late husband, from the benefit fund of the the association, under the constitution and by-laws thereof. Upon this bill and the answer thereto, and the evidence produced by the parties, the learned court below decreed in favor of the plaintiff, and directed the reinstatement of James W. Benton to membership of the association, as of and at the time of his death, and that the association pay to his widow, the plaintiff, as beneficiary, the sum of $3,000.

James W. Benton, the deceased husband of the plaintiff, was a lieutenant in the United States Army, stationed at Fort Robinson, in Nebraska, where he died on the 2d of September, 1896, leaving the plaintiff as his widow. The

deceased made application to become a member of the asso-
ciation, by written communication, dated the 5th of Janu-
ary, 1895, and in which application he nominated his wife,
the plaintiff, the beneficiary to receive all the money that
might be due by reason of his membership, upon his
death, if at the time of his death he should have continued
to be a member of the association. And in this applica-
tion to become a member, he expressly agreed to be bound
by and to conform to the constitution and by-laws of the
association in these terms:

"I agree to make punctual payment of all dues and
assessments for which I may become liable, and to conform
in all respects to the constitution, by-laws and regulations
of the above-named association, now in force or which may
hereafter be adopted by the same or its executive committee,
and to keep the secretary informed at all times of my proper
postoffice address, or the address of any person I may ap-
point to pay assessments for me."

That application was accepted by the association, and a
certificate of membership was issued on the 26th of Febru-
ary, 1895; and that, again reciting the contract and the full
compliance with all the initiatory conditions, declared that
the applicant was thereby constituted a member of the asso-
ciation, agreeable to and upon the conditions set forth in
the constitution and by-laws of the association."

We must, therefore, look to the constitution and to the
by-laws of the association to ascertain and determine upon
what terms and conditions the party became a member of
the association, and upon which he was entitled to remain a
member, with all the rights and benefits resulting there-
from; for it is well settled, by many decisions, that, in such
case as the present, the constitution and by-laws, and cer-
tificate of membership, constitute the contract, and deter-
mine the rights of the members of the association, and that
the rights thus defined and prescribed are to be enforced,
according to the terms of the contract, and not otherwise.

*Union Mutual Assn.* v. *Montgomery,* 70 Mich. 587; *Arthur* v. *Odd Fellows' Assn.,* 29 Ohio St. 587; May on Insurance, Sec. 552. But a mutual benefit association is not a life insurance company, in the restricted sense in which that term is generally used; nor is a certificate of membership of a mutual benefit society a policy of life insurance, in the sense that life insurance is generally understood; yet, it is certainly true, that a certificate of membership of a mutual benefit association is substantially in the nature of a mutual life insurance policy. *Comm.* v. *Wetherbee,* 105 Mass. 161; *State* v. *Mer. Ex. Mut. Ben. Soc.,* 72 Mo. 146; *Sup. Commandery Knights of Golden Rule* v. *Ainsworth,* 71 Ala. 436; *Sherman* v. *Comm.,* 82 Ky. 102; *Illinois Masons' Ben. Soc.* v. *Winthrop,* 85 Ill. 539; *Martin* v. *Stubbings,* 126 Ill. 387; *Comm.* v. *Eq. Benef. Assn.,* 137 Penn. St. 412; *Northwestern Masonic Assn.* v. *Jones,* 154 Penn. St. 99. The object of such association is not for gain or profit, as in the case of the ordinary mutual life insurance company, but, as is declared in the constitution of the present association, "to aid the families of deceased members in a prompt, simple, and substantial manner."

As we have said, the association is not incorporated, but its organization is provided for in a series of articles, denominated the constitution, and certain by-laws have been adopted for the government of its members and of its affairs. They are made part of the contract of each member with the association; and the rights of the parties depend exclusively upon the contract for membership as defined in the constitution and by-laws of the association.

By Section 12 of the by-laws it is provided that—

"Any member who shall fail to pay any of his assessments, annual or extra, thirty (30) days after the same may be due shall be notified by mail (the evidence of which shall be the mailing of a registered letter to him at his address, as shown by the War Department records, or at the last address he may have furnished to the secretary), and if he shall be in arrears thirty (30) days longer *he shall be dropped,* unless the

executive committee shall be convinced that his failure to pay is due to the interruption of mail communications or other causes *without his fault*, in which case they may retain him in membership for a reasonable period thereafter. If the member shall die in the meantime, any charges to which he is liable shall be deducted from the benefit due on such death."

It is manifest from the nature and declared objects of the association, and the provision of its constitution and by-laws, that promptitude and strict punctuality in making payments of the annual assessments by the members is of the first and most vital importance to the success and beneficial existence of the association. Time is of the essence of the contract; and while reasonable time is allowed for making the annual or semi-annual payments of assessments, indefinite or arbitrary indulgence beyond the time prescribed is not contemplated, and there is no power.delegated to grant such indulgence. Indeed, such a power would be in flagrant derogation of the whole scheme of the association. That scheme is founded upon the mutual pledge of duty and good faith of the members to each other, and each to the whole, and the only coercive remedy retained in the hands of the association to secure punctuality in making payments of assessments, is the power of forfeiture of membership. What was said by the Supreme Court in the *Life Insurance Cases* v. *Statham et al.*, 93 U. S. 31, in respect to the necessity of enforcing punctuality of payment of dues, is quite applicable to an association like the present. Indeed, the necessity for strict enforcement of the by-laws, and the rigid adherence to the remedy by forfeiture for non-payment of dues, is even more imperative in an association like the present than in the case of an ordinary life insurance company. In the case of *Statham and others*, just referred to, the court said:

"There must be power to cut off unprofitable members, or the success of the whole scheme is endangered. The in-

sured parties are associates in a great scheme. This associated relation exists whether the company be a mutual one or not. Each is interested in the engagements of all; for out of the co-existence of many risks arises the law of average, which underlies the whole business. An essential feature of this scheme is the mathematical calculation referred to, on which the premiums and amounts assured are based. And these calculations, again, are based on the assumption of average mortality, and of prompt payments and compound interest thereon. Delinquency can not be tolerated nor redeemed, except at the option of the company. This has always been the understanding and the practice in this department of business. Some companies, it is true, accord a grace of thirty days, or other fixed period, within which the premium in arrears may be paid, on certain conditions of continued good health, etc. But this is a matter of stipulation, or of discretion, on the part of the particular company. When no stipulation exists, it is the general understanding that time is material, and that the forfeiture is absolute if the premium be not paid. The extraordinary and even desperate efforts sometimes made, when an insured person is *in extremis,* to meet a premuim coming due, demonstrates the common view of this matter. The case, therefore, is one in which time is material and of the essence of the contract. Non-payment at the day involves absolute forfeiture, if such be the terms of the contract, as is the case here. Courts can not with safety vary the stipulations of the parties by introducing equities for the relief of the insured against their own negligence."

The mutual beneficial aid associations of the character of the present are founded upon life tables, based upon exact calculations as to the average period of life of the members, and if punctuality in the payment of dues by the members is not strictly enforced, the benefit and security of the principle of mutuality is defeated. It is the right, therefore, of each and every member of the association to insist upon an

exact conformity to the requirement of the by-laws in respect to the payment of dues or assessments, as such assessments go to make up the benefit fund to enable the association to "aid the families of deceased members in a prompt, simple and substantial manner," as contemplated by the constitution.

The manner and time for making the annual assessments and the payments thereof are fixed by Sections 4 and 5 of the second article of the constitution; and the time for the payment of the annual dues or assessments, in advance, was April 1, or when elected to be paid in semi-annual payments, the 1st of April, and the 1st of October of each year. Benton had paid his assessments up to the 1st of April, 1896, in semi-annual payments, by checks drawn upon the Citizens' National Bank of Washington City, D. C.; and his assessment for 1896 was due on and after the 1st of April, 1896. He did not, however, within the thirty days from the time the assessment was made, pay the same, either in whole or in part; and, as required by the twelfth by-law of the association, which has been cited, notice dated May 21, 1896, was duly transmitted to him at Fort Robinson, which stated the amount of the assessment ($42.50) and the amount of expenses ($1.70) due from him, and informed him that if he did not pay this amount ($44.20) within thirty days after the receipt of the notice, he would be dropped from the association; and enclosed with this notice was a copy of the twelfth by-law, just mentioned. This notice was received by Benton on the 25th of May, 1896, and, in response thereto, he drew and transmitted to Major Rittenhouse the following check:

"No. 260.          WASHINGTON, D. C., May 30, 1896.

"Citizens' National Bank of Washington City. Pay to Treasurer, Army and Navy Mutual Aid Ass't'n, or order, forty-four $\frac{20}{100}$ dollars.

"44.20.          .          JAMES W. BENTON."

But before this check was received, and while it was in

course of transmission by mail, Major Rittenhouse, the secretary and treasurer of the Army Mutual Aid Association, received from Benton the following telegram:

"FORT ROBINSON, NEB., June 1st, 1896.

"Maj. B. F. Rittenhouse, War Dept., Washington, D. C. Please hold check sent on twenty-ninth until you hear from me. JAMES W. BENTON."

After the receipt of this telegram the check came to hand, and Maj. Rittenhouse, acting on the instruction of Benton, placed both check and telegram in an envelope, and endorsed it: "Benton's check. Hold until Benton is heard from." The envelope so endorsed was placed by Maj. Rittenhouse in the safe of the association, where it was constantly in view, to await further direction from Benton. But Benton was never heard from in regard to the check; and at a meeting of the executive committee of the association, held on the 6th of July, 1896, Rittenhouse, the secretary and treasurer of the association, reported the fact that Benton had failed to pay his dues or assessment; and at the same time he reported the fact of the receipt of the check and telegram, and that he was holding the check subject to the order or direction of Benton. Whereupon the committee directed that Benton be dropped from membership of the association, for non-payment of dues, and the entry was made accordingly; and immediately thereupon the check was enclosed to Benton, together with a notice that he had been dropped for non-payment of dues. It appears in evidence that the check and notice so directed to Benton were duly received by him, and after his death, the envelope enclosing the check and notice was found among his papers unopened. He died, as we have before stated, September 2, 1896. Subsequently, the check, as originally drawn, was tendered to the secretary and treasurer of the Army Mutual Aid Association, and a demand was thereupon made for the payment of $3,000 to the plaintiff as beneficiary of her de-

ceased husband. That demand was refused, and hence this suit.

The defendants, by their answer, controvert the right of the plaintiff, and insist that her deceased husband was legally and rightfully dropped from membership of the association, in default of payment of dues legally assessed, and consequently, that there was nothing due her as beneficiary, under the constitution and by-laws of the association.

Why the check was drawn payable to the treasurer of the Army *and Navy* Mutual Aid Association is not clearly explained. We may suppose that it was by mistake. There was no such association as the Army *and Navy* Mutual Aid Association, and, of course, no treasurer of such association. Whether the bank would have honored the check as it was drawn, if it had been promptly presented, is a question about which we can have no opinion. But the check never was presented for payment, and there was no authority given by the drawer to present it for payment. The drawer had complete power to control his check until it was received as and for payment of dues owing to the association, and he had a right to place it in the hands of Major Rittenhouse to be held, subject to his, the drawer's, future order or direction. Major Rittenhouse was requested, which was tantamount to a positive direction, to hold the check sent "*until you hear from me.*" Upon this notification and direction, Major Rittenhouse received the check, not as in payment of dues owing to the association, but as the agent of the drawer of the check, subject to the latter's future order as to its disposition; and Major Rittenhouse swears positively that he did not receive the check as in payment of dues assessed by the association. No right or property in the check vested in the association, and its treasurer could not rightfully, under the circumstances, have disregarded the instructions of the drawer and presented the check to the bank for payment, and if payment had been refused, have had the check protested for non-payment. He was made simply the custodian

of the check, subject to the order of the drawer, and the latter never thought proper to give any order or direction in regard to the manner of disposing of the check. There can be no question that the drawer himself, in the face of his own express direction to Major Rittenhouse, to hold the check *until he was heard from*, in the absence of any subsequent direction upon the subject, could never have insisted that the check had been received in payment of dues, and that it ought to have been presented for payment; and that being the position of the drawer, the plaintiff, claiming under the drawer, can occupy no better position or superior right to that of the drawer himself. And it can hardly be seriously contended that the subsequent tender of the check by the plaintiff, after the death of her husband and long after the expiration of the time limited for payment, can avail to restore the deceased member to the position he would have occupied if he had made payment of his dues in due time, and according to the requirement of the by-laws of the association. Nor can such tender of the check, even if forfeiture of membership had not been declared in the lifetime of the husband, aid her claim in any manner. It has been held in several cases, and laid down as a settled principle by text writers of authority, that the death of a drawer of a check operates as a revocation of the authority of the bank or banker upon which it is drawn to pay it, though it is clear that if the check be presented and paid before notice of the death, the payment is good. *Tate* v. *Hilbert*, 2 Ves. Jr. 118; Byles on Bills (Sharswood's Ed.), 24, 25; Chitty on Bills (13th Am. Ed.), 429; Morse on Banking, 278. The first branch of this general proposition may admit of some doubt, upon the more recent authorities; but there is no doubt of the general proposition, that if the drawer of a check, or other negotiable instrument, die before delivery of the instrument and acceptance by the payee, the check or other instrument becomes a nullity and can not be delivered by his representative. *Bromage* v. *Lloyd*, 1 Exch. 32; *Clark* v.

*Boyd,* 2 Ohio, 56; *Clark* v. *Sigourney,* 17 Conn. 517; 1 Danl. Neg. Inst. (2d Ed.), 58; 2 Danl. Neg. Inst. (2d Ed.), 569, 570.

In this case, as we have seen, there was no real or valid delivery of the check to the association in payment of dues, and, of course, upon the death of the drawer, the check became a nullity, if not before his death. The suspension of the check, made payable to a non-existent character, though drawn and placed in the custody of Major Rittenhouse, would seem to have been in accordance with a preexisting design to cease his connection with the association. His failure to give direction to Major Rittenhouse in regard to the check, coupled with his declaration to the witness Cobb, would seem to indicate such purpose. According to the testimony of this witness, the deceased told him, the witness, "that he did belong to the defendant association, but he had lapsed, and he asked the witness if he could rejoin it. I told him, says the witness, that I did not know; that General Stanton was there, and he had better speak to the General about it." This was at Fort Robinson, about August 10, 1896. General Stanton was at that time vice-president of the association, and was Paymaster-General of the Army of the United States, and was on an official tour, and the witness was his clerk. It is urged on behalf of the plaintiff that this witness ought not to be believed; that the circumstances related by him throw discredit upon his testimony. But there is nothing in the evidence to impeach his testimony, and it will not do simply to assert, as is done here, that his testimony "is improbable, ridiculous, and that it bears the stamp of untruth upon its face." There is nothing in the facts related by him to warrant such an imputation. He held a confidential and creditable position as clerk to the Paymaster-General, and his character for veracity could only be impeached by evidence to show that his general character for truth and veracity among his neighbors was bad. This was not attempted.

But it is insisted that though the deceased may have been

in default in the payment of his dues, yet he could not be dropped from membership of the association without having first been given special notice to appear and show cause against being dropped for the alleged default. To this, however, we do not agree. There is no pretense of any surprise to the member that was dropped. He had received all the notice that was contemplated by the constitution and by-laws of the association, and he was fully aware that he was in default in the payment of his dues; that the time for payment had long since elapsed; and, moreover, he was fully aware of the penalty prescribed for such default. Why, then, the necessity for any further notice? The law upon this subject, and in a case like the present, would seem to be too well settled to admit of a question. Notice in such case, other than that of the fact, of the time and amount of the assessment due, such as was given in this case, is not necessary or required, unless it be by the express terms of the contract, or by-laws of the association. *Rood* v. *Pass., etc., Ben. Assn.*, 31 F. R. 62; *Benevolent Society* v. *Baldwin*, 86 Ill. 479; *Madeira* v. *Merchants' Ben. Society*, 16 F. R. 149; *Chamberlain* v. *Lincoln*, 129 Mass. 70; *Zeigler* v. *Mutual Aid & Ben. Life Ins. Co.*, 1 McGloin, 284; *Yoe* v. *Mut. Ben. Assn.*, 63 Md. 86; Bacon, Benefit Societies & Life Ins., Secs. 352, 354, 385; Niblack, Mut. Ben. Societies, pp. 336, 337, Secs. 307, 385. The result of the cases is well stated in Vol. 16, p. 81, of the Am. & Eng. Encyc. of L., where it is said: "In most societies, however, it is provided in the by-laws forming a part of every contract, that the mere non-payment of an assessment or due shall operate to suspend or forfeit the contract. The parties have a right so to stipulate, and having done so in clear and express terms, the courts will give the contract due force and effect."

Upon the whole case, we are clearly of opinion that the affirmative action taken by the executive committee of the association, in dropping the delinquent member, was strictly

in accordance with the provision of the twelfth by-law, and no other notice was required upon which to base that action than the notice that was actually given by the secretary and treasurer, and received by the delinquent member. The latter was legally dropped from membership of the association, and the plaintiff has no valid claim against said association; and therefore the decree appealed from must be reversed, and the cause be remanded, that the bill may be dismissed by the court below; and is so ordered.

*Decree reversed and cause remanded.*